# In the United States Court of Federal Claims

No. 15-588 C

Filed: June 23, 2015

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| GUAM INDUSTRIAL SERVICES, INC., | * | |
| Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES, | * | Bid Protest, 28 U.S.C. §1491(b); |
| Defendant, | * | Preliminary Injunction, RCFC 65(a)(1). |
| v. | * | |
| CABRAS MARINE CORP., | * | |
| Defendant-Intervenor. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Lee Dougherty**, Offit Kurman, P.A., Tysons Corner, Virginia, Counsel for the Plaintiff.

**Amelia R.S.H. Lister-Sobotkin**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

**Paul Honigberg**, Blank Rome LLP, Washington, D.C., Counsel for the Defendant-Intervenor.

**MEMORANDUM OPINION AND ORDER REGARDING PRELIMINARY INJUNCTION**

**I.   RELEVANT FACTS.[1]**

On June 10, 2015, Guam Industrial Services, Inc., d/b/a Guam Shipyard ("Guam Shipyard") filed a Complaint alleging that, in 2012, Guam Shipyard was awarded an Indefinite

---

[1] The facts described herein are derived from: Plaintiff's June 10, 2015 Complaint ("Compl."); the June 17, 2015 Declaration of Contracting Officer, Military Sealift Command ("Siebeking-Knox Dec."); the Government's June 19, 2015 Notice Of Corrective Action; and representations made by the parties' counsel during telephone conferences with the court on June 10, 17, and 22, 2015.

Delivery Indefinite Quantity ("IDIQ") contract "to provide 'ship repair services on [Military Sealift Command ("MSC")] vessels in Guam . . . includ[ing,] but . . . not limited to, pipefitting, welding, machinists, electrical work, boiler making and repairing, and diesel mechanics, etc.'  A second company, Gulf Copper Ship Repair, NC ("Gulf Copper"), received [an] IDIQ contract as well."  Compl. ¶ 13 (quoting Guam Shipyard's IDIQ contract).

In late 2013, "Cabras Marine Corporation ("Cabras") was awarded a different IDIQ to provide ship services . . . . Cabras' IDIQ contract was to 'perform major ship repair availabilities that, owing to operational and mission requirements, are restricted to performance under [its] contract.'"  Compl. ¶ 14 (quoting Cabras' IDIQ contract).

On March 23, 2015, the MSC issued a Voyage Repair Availability Request For Quote ("VRA RFQ"), under IDIQs awarded to Gulf Copper, Guam Shipyard, and Cabras, for repairs to be made to the USS FRANK CABLE between June 1–30, 2015.  Compl. ¶¶ 15–16.  Thereafter, the MSC accepted Requests for Clarifications ("RFCs") from prospective offerors and issued Questions and Answers ("Q&As").  In response, the MSC issued nine amendments to the VRA RFQ.  Compl. ¶ 17.

On April 17, 2015, Guam Shipyard submitted a bid.  Compl. ¶ 18.

On May 1, 2015, the MSC issued a tenth amendment, closing discussions and requesting "final quote revisions."  Compl. ¶ 18.

On May 21, 2015, the MSC announced that the VRA RFQ was cancelled.  Compl. ¶ 20.

Shortly thereafter, "Guam Shipyard learned that the repair work on the USS FRANK CABLE was awarded to Cabras, not through its quote submitted previously in response to the VRA RFQ, but as a direct award under its [2013] IDIQ contract."  Compl. ¶ 21; *see also* 6/22/15 TR (MSC Commanding Officer representing that Guam Shipyard was advised at least by on June 2, 2015 of the status of the award to Cabras).

On June 4, 2015, the MSC stated that the work on the USS FRANK CABLE was "mischaracterized as a voyage repair," *i.e.*, VRA, and "given the estimated dollar value, duration, and nature of the work to be performed, the repairs were 'major work' that should have been ordered under the direct award provisions of Cabras' [2013] contract."  Compl. ¶ 23.

On June 10, 2015, Guam Shipyard ("Plaintiff") filed a bid protest in the United States Court of Federal Claims and a Motion For Preliminary Injunction And Permanent Injunction.  On June 10, 2015, the court convened a telephone status conference with the parties.  6/10/15 TR 1–14.  At that conference, the Government advised the court that Cabras began work on June 1, 2015, and had completed 34% of the job that was estimated to conclude on June 30, 2015.  6/10/15 TR 3–4.  The court asked what the MSC intended to do with the ship on June 30, 2015, and the Government responded:

The [USS FRANK CABLE] will be leaving Guam for a special mission they were not allowed to discuss, and she will be returning to Guam in the middle of August [2015].

6/10/15 TR 4.

At that point, MSC Counsel interrupted and stated:

I . . . spoke to . . . one of the engineers down in our Norfolk office and he confirmed that the mission that was originally scheduled in July is not going to occur. So, I don't believe that ship is going to get underway on the 30th, and I don't think there's anything currently scheduled. But that, of course, could change.

6/10/15 TR 4–5.

With this clarification, the court requested that the MSC voluntarily stay further action on the contract until the administrative record was produced. 6/10/15 TR 7. The Government advised the court that production would take two weeks, *i.e.*, until June 24, 2015, although "that would push us." 6/10 15 TR 5, 7. The Government added, however, "we don't need an administrative record to decide the preliminary injunction because there's no jurisdiction[.]" 6/10/15 TR 7.

The court emphasized:

We're not issuing a preliminary injunction. I'm asking for the [MSC] not to do anything on the contract, until I can get a record. But you say I don't have any jurisdiction. I don't have any papers in front of me. I don't have a motion to dismiss. I don't have anything.

6/10/15 TR 7–8.

The Government counsel responded:

I think if we brief the preliminary injunction motion, we could expedite that without doing the entire administrative record, we could expedite that quicker.

6/10/15 TR 9–10.

The court restated:

[I]f you want to file a motion to dismiss, you can do that. I may say to you[,] I don't know enough to dismiss . . . or I might agree with you. But that's the—first step.

>I am not . . . going to move to go to a preliminary injunction until I have an administrative record. That's how we do things. I need to have a record to know whether or not someone has a likelihood of succeeding on the merits.

6/10/15 TR 10.

>The court added:

>So, here [is] what I suggest you do. You do what you want to do. If you don't agree to stay the case, I'm going to authorize my law clerk today to enter in a TRO, whether it's been asked for or not, until I get back in the United States on—back in the office, let's just say on Wednesday morning. If you don't like that, you're welcome to appeal that with the Federal Circuit. And the reason for me asking for that is I don't know enough about what's going on right now, and the ship is not going to go into service, so there's no harm to the Government for the moment, until we wait and see what happens. Okay. So, if you don't agree, he'll issue a TRO under my authority. Now, if you do agree, to allow us to, basically, stop the contract, okay, until we get an administrative record and you can then file our motion, we'll see where we go from there. I'll be back in States, we can have another conference on Wednesday. All right?

6/10/15 TR 12.

>The court next inquired about potential intervenors and the Government responded:

>[W]e have . . . reached out to the other two possible interveners [*sic*]. Cabras, which is currently doing the work, has indicated that they do not intend to intervene.

6/10/15 TR 13.

>On June 11, 2015, pursuant to the court's request, the Government filed a Notice Of Voluntary Stay until the next status conference scheduled for June 17, 2015.

>On June 17, 2015, Cabras Marine Corp. ("Intervenor") filed a Motion To Intervene that the court granted. 6/17/15 TR 4.

>On June 17, 2015, the MSC contracting officer filed a Declaration that stated:

>1) The USS FRANK CABLE is a submarine tender homeported in Guam. The ship, which is a warship serving a national defense mission, serves as a mobile support facility for U.S. nuclear submarines in the U.S. 7th Fleet area of operations. That area includes the Western Pacific and Indian Oceans. The USS FRANK CABLE resupplies and conducts scheduled or emergent repairs to deployed submarines and provides limited support to deployed surface ships. It is a critical defense asset with specialized facilities for servicing nuclear submarines.

4

6/17/15 Siebeking-Knox Dec. at ¶ 1.

* * *

Specifically,

    3) Any additional delay would profoundly compromise the ship's ability to get underway for typhoon avoidance, as well as its ability to meet unscheduled mission requirements. The ship is currently not in a condition to get underway owing to the partially completed work resulting from the stop work order.

    4) The suspended work most significantly affecting the ship's ability to be fully operational:

    a. The ship's magnetic and gyro compasses (Work Items 402 and 403) were both being serviced. The ship requires a working compass for safe navigation. The magnetic compass has been sent to the Continental U.S. for repair. Therefore, maintenance on at least the gyrocompass must be completed immediately to ensure reliable function of that system.

    b. Work Item 501 requires testing of various relief valves, including those on the ship's service turbine generators (SSTGs). The SSTGs provide electrical power to the ship. The USS FRANK CABLE requires two SSTG's for normal operation with a third SSTG providing ABS required redundancy in order to get underway. Valves for two of the ship's four SSTGs are at Cabras's facility in an unknown condition. The SSTGs cannot operate with the valves removed. Therefore, work on the valves must be completed immediately to ensure a sufficient number of SSTGs are available for the safe operation of the ship.

    c. The ship does not have its required life rafts installed. The existing life rafts were removed as part of Work Item 605. The replacement life rafts are on Guam, but work remains to correctly mount the rafts for their proper operation in the event of an emergency. The rafts are lifesaving equipment for the crew's use in the event of an emergency. Although the new rafts could be temporarily placed aboard the ship, they could not be rigged to deploy as designed in the event of an emergency. Such a safety compromise would require USCG approval, which is unlikely. Immediate completion of the life raft installation is needed for crew safety.

      5) Typhoons on Guam are a constant threat. In the event of a typhoon, the ship is more vulnerable to damage and loss in port than while underway. The ship is kept in a 96-hour readiness status while repair work is being performed to support a typhoon sortie. However, the ship's Commanding Officer states that historically the ship should be ready to sail within 72 hours of a storm warning. The Commanding Officer believes his crew can make the ship ready to sail within 48 hours of a storm warning, although the deficiencies related to Work Items 402, 403, 501, and 605 would have to be addressed. Nevertheless, the efforts of the crew would not be a substitute for the proper repair of critical systems and the correction of safety deficiencies. The current inability to immediately correct these deficiencies, particularly those affecting the ship's ability to get underway, has unacceptably placed the ship and crew at risk. The Government suffers harm each day the ship remains in a degraded material condition rather than being in a proper state that maximizes the safety of the ship and crew, for whom the ship is home.

6/17/15 Siebeking-Knox Dec. at ¶¶ 2–4.

On June 17, 2015, the Government filed an Unopposed Motion For Protective Order that the court granted on June 18, 2015.

On June 17, 2015, the court also convened a telephone status conference, where the Declaration was discussed.

    THE COURT:    I see the declaration . . . of the contracting officer, and I appreciate that the work needs to be done. But the [MSC] didn't seem to feel that the [typhoon] season was any problem because they took their good ol' time scheduling . . . and did not even put out the request until—we've checked the website to find out when the rainy season and the [typhoon] season is. So, there were—they didn't seem to be worried about any of that in May. So . . . that doesn't impress me.

                \* \* \*

                If you urgently needed to do this to get the ship out of there, you certainly took your good, sweet time in getting this work underway. That's a fact. . . . [W]hy didn't you do this work six months ago?

    GOV'T COUNSEL:    [T]yphoons can develop at any time and the ship would have to be put out to sea within a couple days, very quickly in order to avoid the monsoon. And as is set out in the declaration of the contracting officer, there's a number of very critical work items that are currently dismantled essentially, including the life raft, the turbine generators and

|  |  |
|---|---|
| | the compasses.  Those are the most critical issues right now[.] |
| THE COURT: | [T]he problem is [the MSC] knew that when [the MSC] began doing this work, and if [the MSC] needed to have that boat ready to go, you should have been on this six months ago, not now.  It doesn't wash, okay? |
| | Also, you talked about the mission.  The last time we talked . . . [t]he gentleman from the [MSC] said [the USS FRANK CABLE] didn't have an assignment . . . and likely wouldn't have one for several months. |
| | Now, you may need all of this done, but [the MSC] could have scheduled it earlier.  And[,] the Plaintiff is entitled—he may not have a case, but he's entitled to go through the process, which is going to take some time, you see.  You just don't get to jam it[,] because you feel like it. |
| GOV'T COUNSEL: | However, while the Plaintiff is entitled to go through the process, the Plaintiff still has to meet the minimum requirements for a preliminary injunction.  The Plaintiff – |
| THE COURT: | Well, that's true, but I have to look at a record and decide whether and—look at the briefs and decide that issue . . . I'm sorry you need to have this done yesterday, but I can't do my job—you know, it's taken you two weeks to get the administrative record put together. . . .  [T]he Plaintiff is entitled to go through the process and I am entitled and required by Congress to review what the contracting officer has done. |
| | Now, that is—it is inconvenient to [the MSC].  But, you know, when the [MSC] scheduled this basically during the rainy season, which it started in May.  I don't understand if this was so urgent why [the MSC] waited that long.  That was [the MSC's] decision.  But that doesn't mean that you get to preempt the Plaintiff from having its day in court, okay? |
| | Now, they may be wrong and there may be nothing wrong that was done.  But you've got to let that process go through.  So, you've got a third of the work done. |
| | Now, if I let you go on ahead and continue, then all the work is going to be done and, so, tell me exactly what it is the |

7

                                Plaintiff is supposed to do if I find—what if I find that the [MSC] was—did act in an arbitrary and capricious manner, that they fit squarely into [*Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147 (Fed. Cir. 1994)].

                                \* \* \*

GOV'T COUNSEL:  Although the work may have been scheduled in the rainy season, the [MSC] obviously did not expect a bid protest in the middle of this project. It did not expect this project to be put on hold for potentially months. And what's—

THE COURT:  Well, what did you think was going to happen? That the other [bidders] were going to say that's fine? You could have had a protest by the other [bidder] that bid on this. Why would that not be something that you would factor in?

GOV'T COUNSEL:  Well, Your Honor, the work simply needs to be done and it has to be scheduled when the ship is available. And as to these three—these three elements that are very critical, the compass, the turbine generators and the life raft, the ship cannot put out to sea unless those are fixed.

THE COURT:  That's not my problem. That's not my problem.

GOV'T COUNSEL:  I mean, it's—Your Honor, it's akin to driving right now without airbags, a seatbelt and with an obstructed windshield.

THE COURT  I understand that, but the point is it's [the MSC's] boat. Presumably, [the MSC] know[s] how to schedule things about when [the boat] need[s] repairs and you've got to factor in time that you could have a protest. It would be malpractice not to do that. I mean, you don't know whether someone's going to protest or not. You can't just assume that they won't. I mean, I sympathize with your problem, but I didn't create it, [the MSC] did. . . .

                                I don't know why they changed course from the solicitation and I—this affidavit is quite interesting because, first of all, portions of it are hearsay. We've got . . . the commanding officer's views expressed by the contracting officer. That carries no weight with me.

|  |  |
|---|---|
|  | And we've got the magnetic compass has been sent to the continental United States for repair. Is the Intervenor doing that work in the United States? Mr. Intervenor? |
| INT. COUNSEL: | Your Honor, we're so new to this matter, I don't know the answer to the question. |

\* \* \*

|  |  |
|---|---|
| THE COURT: | If you've got the compass in the United States and the storm comes, you're not going to get the compass back in time to get the boat out anyway, you see. So, that's an interesting argument, but it doesn't wash based on [the contracting officer's] declaration. |

Two of the valves are in the Intervenor's facility in an unknown condition. Well, . . . you don't know what the condition is, how am I supposed to figure it out? For all I know, it could be perfectly fine. For all you know, it could be perfectly fine based upon—I mean, I—this is not very helpful is what I'm trying to say.

Presumably, if there's a typhoon, the crew will go someplace and get off the boat. So, they're not at risk any place. I presume that you have a place for them someplace in Guam where they can hide in a basement. You know, I'm sure that you need to get the boat out of there, but you have waited this time period to get this job done and that is not my problem. It may be that what you've done by awarding this to the Intervenor is fine, but I am not going to allow [the MSC]. . . to continue this work based on this declaration. This is not adequate.

You also say on your -- this is interesting because the [declaration] makes my point. "Typhoons are a constant threat." Well, didn't you think about that when you decided to do this work in this way?

We don't even know that this boat is going to be needed for anything. . . . [T]o me, this demonstrates is just very poor planning by Military Sealift Command. And I'm sorry for it, but that's what, to me, it looks like. And I intend to do the job that Congress has asked me to do. So, we're going to wait for your papers.

|  |  |
|---|---|
|  | I don't know whether the Plaintiff is planning to amend their motion for injunctive relief that they filed in June based on your statement or what they intend to do. |

\* \* \*

| PL. COUNSEL: | Well, again, Your Honor, we've sought injunctive relief and a restraining order and we think it's appropriate. This work has been scheduled—as far as we know, this is routine maintenance that was scheduled, you know, according to the Navy, at least as far back as October of last year. We found a scheduling order scheduling this work for this period. So, this isn't a surprise. |
|---|---|
|  | And even under the declaration, the hearsay, the commander says even in its current condition, he could get it out of port within 48 hours[.] |

\* \* \*

| PL. COUNSEL: | If a typhoon popped up and the Government truly thought that it was an emergency and they needed to do, you know, some partial lifting the injunction in order for an emergency situation, frankly, I wouldn't object to that. |
|---|---|

\* \* \*

| THE COURT: | Let me ask the Intervenor something. Have you been paid for the third of the work that you've done? |
|---|---|
| INT. COUNSEL: | Your Honor, we don't know that. I don't know the answer to that question either. But we will have all that information in the next—you know, we'll answer the Court's questions and others within the next 48 hours. We have this issue with the time change and travel, but we can certainly get the answer to that question, Your Honor. |
| THE COURT: | Well, let me tell you, we have a practical problem. I had asked the Government to voluntarily stop work on this until I could get back into the country and we could get the record and motions and everything filed. That . . . agreement by the Government ends today. So, we're either going to have to extend it for a period of time[.] From your perspective, if you've been paid for the third of the work that you've done, okay, and [the MSC has] done something wrong, [Guam |

10

|  |  |
|---|---|
| | Shipyard doesn't] get the contract. They just have to go through the process again. |
| INT. COUNSEL: | Yes, Your Honor. |
| THE COURT: | Okay. And I don't know what happens after that. I mean, I don't know whether that will be helpful or not. I don't know if there's something that the [MSC] can be creative enough to make the problem go away. That's not up to me. They say they need to have this done. [Guam Shipyard] want[s] to have a job. [Cabras] want[s] to have [the] job. [The MSC has] work to be given out. Maybe they can be creative and find a way of solving the Plaintiff's problem on another piece of work. I don't know. And make the case go away. |

But it seems to me [the MSC] need[s] to understand that—and [Cabras] would feel the same way[,] if you were protesting. I mean, you know, it does you no good basically to protest if the other guy basically has done all the work and there's no work to be had. The only thing I can do at that point is make the Government pay for their mistake, and that's really not a good way of, you know, doing business for the Government. I mean, they shouldn't be putting themselves in a position where they're in that type of situation, but they have.

So, let me see what we can do here. Can I get the Government's agreement that we can at least continue the stay that we have through another week to at least let the Intervenor find out some facts and get some—in a position to put some paper together? [The MSC is] not going to get your work done anyway until Friday. The Plaintiff has got a right to respond. I don't know why we can't wait for another week, at least. I can't rule . . . overnight. I've got to be able to look at things.

\* \* \*

So, I don't know what the Government's counsel is planning to do, but I'm asking her to extend it. And I think what we ought to do is have her work with the Intervenor and Plaintiff's counsel to figure out a reasonable time period so we don't do this in dribs and drabs. Now, if you want to push me, I will enjoin it and I will say why and I will rip apart this [declaration], which is not going to be very

>            pleasant for you to look at or your supervisors to look at. So, that's where we are.
>
> GOV'T COUNSEL:   I've spoken with the Military Sealift Command—[and] my client is not willing to extend the voluntary stay because of these critical safety issues that are outstanding.
>
> THE COURT:   Okay, all right. Then I will—I'm going to enter a preliminary injunction on the phone today based on the reasons that I have set forth in examining the affidavit. We will try to get a short written opinion out as soon as we can early next week. But the procurement is enjoined as of today.
>
> *   *   *
>
>            I am doing this to protect myself, to protect my—the job that I have to do. . . I cannot put myself in a position of not having a record before me and being forced in a position where the [declaration] really does not support the request that you made today on the phone. So, I'm going to enjoin it as of today, issue a preliminary injunction as of today. We will put together a decision . . . early next week. . . . I don't know what the merits are because I don't have any of the paperwork yet. I don't even have—I don't have the administrative record. So, that's where we are.

6/17/15 TR 6–19.

      The Government indicated that it was ready to file the administrative record on June 19, 2015. 6/17/15 TR 5.

      Pursuant to the June 17, 2015 status conference, the court entered a Preliminary Injunction Order, indicating that a written opinion would follow.

      On June 19, 2015, the Government was supposed to file the administrative record but instead filed a Notice Of Corrective Action, indicating the:

> cancellation of the request for quote (RFQ) for repair and maintenance work on the USS FRANK CABLE, originally intended to be performed from June 1, 2015 through June 30, 2015, which is the subject of the instant protest, terminating for convenience the delivery order previously issued to defendant-intervenor Cabras Marine Corp. for the work encompassed in the RFQ, and reissuing the RFQ, modified to take into account work performed prior to the filing of the instant protest and subsequent stay.

6/19/15 Gov't Notice Of Corrective Action.

On June 22, 2015, the court convened another telephonic status conference. During that conference, the Government stated that it intended to take corrective action by rescinding the cancellation for quotes, except for those items that were totally complete or so complete as to be impracticable to re-bid.[2] When the court asked the Intervenor how much it had been paid, the Intervenor replied that it had one invoice for over $500,000 and itemized additional costs of $684,000. Plaintiff expressed concern that if the Intervenor had already spent $1.1 million and the total contract award was $1,722,848.84 (Compl. ¶ 15), there would be little left to do on the contract. The Government responded that Plaintiff waived the right to complain, since it waited ten days after the contract start date to file this protest. The court rejected this argument.

## II.   LEGAL STANDARD FOR A PRELIMINARY INJUNCTION.

The United States Court of Federal Claims has the authority to issue a preliminary injunction only on notice to the adverse party. *See* RCFC 65(a)(1). The United States Court of Appeals for the Federal Circuit requires the trial court to consider:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (applying the factors for a permanent injunction). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Vill. of Gambell, Ark.*, 480 U.S. 531, 546 n.12 (1987). "No one factor, taken individually, is necessarily dispositive. . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

## III.   THE COURT'S RESOLUTION.

### A. Whether Plaintiff Is Likely To Succeed On The Merits.

Based on the June 10, 2015 Complaint, Plaintiff alleged a plausible case that the MSC improperly cancelled the solicitation. *See Parcel 49C*, 31 F.3d at 1151 (affirming a "trial court's findings that the Government's justifications for cancellation of the procurement were pretextual and incredible"). In addition, as discussed herein, the contracting officer's June 17, 2015 Declaration is internally inconsistent, contrary to the facts, based on hearsay, and clearly was manufactured as a post-hoc justification, disregarding Plaintiff's right to challenge the MSC's actions in this case. The Government has represented that the administrative record would be

---

[2] As of the time of publication, the court had not received the official transcript from the June 22, 2015 status conference. The facts in this paragraph were derived from the law clerk's notes taken during the conference.

provided by this date. But, as of close of business at 5:00pm EST June 23, 2015, the Government still has not produced the administrative record, without which the court cannot evaluate MSC's actions. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."). Under these circumstances, a preliminary injunction is necessary to maintain the *status quo*.

### B.  Whether Plaintiff Is Likely To Suffer Irreparable Harm In The Absence Of Relief.

According to the Government, nearly 34% of the work under the disputed contract is complete, and the final completion date is June 30, 2015. 6/10/15 TR 4. Therefore, if the court does not enter a preliminary injunction, the contract will be completed prior to adjudication of this bid protest, and Plaintiff would be irreparably harmed.

### C.  Whether The Balance Of Equities Is In Plaintiff's Favor.

MSC advised the court that the USS FRANK CABLE is not needed to perform any military missions in the immediate future. 6/10/15 TR 4–5. Although repairs to this ship are necessary, the MSC elected to schedule maintenance during this time when a typhoon is "a constant threat." 6/17/15 Siebeking-Knox Dec. at ¶ 5; *see also* 6/17/15 TR 13 (Plaintiff's counsel) ("This work has been scheduled—as far as we know, this is routine maintenance that was scheduled, you know, according to the Navy, at least as far back as October of last year."). In addition, the ship's magnetic compass is currently in the continental United States for repair, so if a typhoon occurred, the MSC would be in no position to move it. 6/17/15 Siebeking-Knox Dec. at ¶ 4a. Therefore, there appears to be no compelling reason for the MSC not to allow Plaintiff the opportunity for judicial review. 6/17/15 TR 8 (the court) ("I don't understand if this was so urgent why [the MSC] waited that long. That was [the MSC's] decision. But that doesn't mean that [the MSC] get[s] to preempt the Plaintiff from having his day in court."). Under these circumstances, the balance of the equities weighs in Plaintiff's favor.

### D.  Whether An Injunction Is In The Public Interest.

"The public has an interest in honest, open[,] and fair competition, and [w]henever a plaintiff is improperly excluded from that process, that interest is compromised." *Global Computer Enters., Inc. v. United States*, 88 Fed. Cl. 350, 461 (2009) (internal quotation marks and citations omitted). "Healthy competition ensures that the costs to the taxpayer will be minimized." *Id.* (quoting *SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731, 747 (2004)). "The public interest is clearly served when suppliers engage in fair and robust competition for government contracts, and granting injunctive relief in this case ensures that public confidence and competition in the federal procurement process will be preserved." *Id.* (internal citations and quotation marks omitted); *see also PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003) ("[T]he public's interest likewise lies in preserving the integrity of the competitive process[.]").

In this case, the public's interest in open, honest, and fair government contracting outweighs any potential harm from a preliminary injunction. MSC counsel reported that the USS FRANK CABLE will not be going on a mission in the immediate future. 6/10/15 TR 4–5. There is no indication that a preliminary injunction while the court conducts an expedited review of the

administrative record will threaten any public interest. Since the MSC may have "violated its duty to conduct a fair procurement," a preliminary injunction serves the public interest. *See Parcel 49C*, 31 F.3d at 1151.

## IV. CONCLUSION.

For these reasons, the Government is **preliminarily enjoined** from performing any work on the disputed contract until the court can adjudicate the merits of Plaintiff's bid protest.

**IT IS SO ORDERED.**

s/ Susan G. Braden<br>
**SUSAN G. BRADEN**<br>
**Judge**