# In the United States Court of Federal Claims

No. 15-588 C
Filed: August 3, 2015[1]

| | | |
|---|---|---|
| GUAM INDUSTRIAL SERVICES, INC., Plaintiff, v. THE UNITED STATES, Defendant, v. CABRAS MARINE CORP., Defendant-Intervenor. | * | Administrative Procedures Act ("APA"), 5 U.S.C. § 706; Bid Protest, 28 U.S.C. §1491; Competition In Contracting Act ("CICA"), 31 U.S.C. § 3551(2)(A); Federal Acquisition Regulations ("FAR"), 1.102 (Guiding Principles), 1.102-2 (Performance Standards), 1.602-2 (Responsibilities), 3.101-1 (Safeguards); Federal Acquisition Streamlining Act ("FASA"), 41 U.S.C. § 4106(f)(1); Preliminary Injunction, RCFC 65(a)(1). |

**Lee Dougherty**, Offit Kurman, P.A., Tysons Corner, Virginia, Counsel for the Plaintiff.

**Amelia R.S.H. Lister-Sobotkin**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

**Paul Honigberg**, Blank Rome LLP, Washington, D.C., Counsel for the Defendant-Intervenor.

---

[1] On July 29, 2015, the court forwarded a sealed copy of this Memorandum Opinion And Final Order to the parties to delete from the public version any confidential and/or privileged information, and note any citation or editorial errors requiring correction. The court has incorporated some of these comments and corrected or clarified certain portions herein.

## MEMORANDUM OPINION AND FINAL ORDER

## I. RELEVANT FACTUAL BACKGROUND.[2]

On June 29, 2012, the Military Sealift Command ("MSC" or "Government") awarded Guam Industrial Services, Inc. d/b/a Guam Shipyard ("Guam Shipyard") an Indefinite Delivery Indefinite Quantity ("IDIQ") multiple award contract ("MAC") to provide "ship repair services on MSC vessels in Guam . . . includ[ing,] but . . . not limited to: pipefitting, welding, machinists, electrical work, boiler making and repairing, and diesel mechanics, etc." AR 7.

On May 17, 2013, MSC awarded Cabras Marine Corp. ("Cabras") an IDIQ contract to "perform major ship repair availabilities that, owing to operational and mission requirements, are restricted to performance under [its] contract." AR 39, 53.[3]

On March 23, 2015, MSC issued a Request For Quotes ("RFQ") to Guam Shipyard and Cabras, containing thirty-one work items for maintenance and repair work on the USS Frank Cable from June 1–30, 2015. AR 111–16. Over the subsequent weeks, MSC accepted Requests For Clarifications ("RFCs") and issued Questions and Answers ("Q&As") in response. AR 316–20, 330, 391–92, 522–23, 540–41, 596–679. During that same time, MSC issued nine amendments to the RFQ. AR 312–523, 536–63, 571–89.

On April 6, 2015, Joe Cruz, President of Cabras, emailed Peter DeSimone, a supervisory mechanical engineer for the special mission ship program, to inquire why the RFQ was being competed instead of negotiated directly with Cabras. AR 1306. On April 7, 2015, Neil Lichtenstein, Director of the N75 Life Cycle Engineering Division, emailed Mr. DeSimone that he "d[id]n't think there is much that we can do about this upcoming award [of the RFQ]. . . . [He was] worried it would draw too much attention to cancel the current solicitation and issue the work as a delivery order to Cabras." AR 1305. That same day, Michael Jensen, a port engineer, emailed Mr. DeSimone and Mr. Lichtenstein to list potential dangers of eliminating competition: "they will get complacent, greedy, not finish Avail[abilities] on time and we end up with another [Guam Shipyard] by a different name." AR 1303. On April 8, 2015, Mr. Lichtenstein replied that it was "[t]oo late . . . for the upcoming" RFQ, but that similar future contracts "should be planned for award under the Single Source Ship Repair contract with Cabras." AR 1302.

---

[2] The facts described herein are derived from: the June 23, 2015 sealed Administrative Record ("AR 1–1311"); the June 29, 2015 supplemental sealed Administrative Record ("AR 103.001–13.028" and "AR 1312–54"); and representations made to the court during telephonic status conferences held on June 10, June 17, and June 22, 2015 ("6/10/15 TR 1–15"; "6/17/15 TR 1–23"; and "6/22/15 TR 1–17").

[3] Guam Shipyard alleges that in January 2014, MSC awarded it a $1,722,848.84 Voyage Repair Availability ("VRA") delivery order to repair the USS Frank Cable, with an effective date of February 3, 2014 and completion date of March 5, 2014. Pl. Mot. at 3–4. But, Guam Shipyard did not provide a citation, and the court was unable to find evidence of this VRA in the Administrative Record.

On April 14, 2015, Stephen Hughes, a MSC contracting officer ("CO"), replied that MSC "should be using [Cabras's IDIQ contract] for all long duration and/or complex work packages." AR 1296.

On April 16, 2015, Guam Shipyard and Cabras both submitted initial quotes in response to the March 23, 2015 RFQ. AR 680–737.

On April 23, 2015, Christina Martinez, a contract specialist administering the RFQ, emailed Mr. Hughes that she believed the work was miscategorized as a VRA, and that it would take more than thirty days to complete the work. AR 775. She suggested either cancelling the solicitation or reducing the work. AR 775. On April 24, 2015, Mr. Lichtenstein replied that, if MSC "believe[d] that the present solicitation under the GSR IDIQ can be cancelled at this stage and awarded under the single source ship repair IDIQ without jeopardy of delaying the performance period or causing a contract protest situation, then we have no issues with following that course of action." AR 789.

On April 27, 2015, Ms. Martinez stated that MSC "will be doing more harm than good in cancelling this solicitation and starting over with a different strategy[;] therefore[,] we will be proceeding with making award [in accordance with] the current solicitation." AR 840.

On April 28, 2015, MSC opened discussions with Guam Shipyard and Cabras. AR 848–55.

On May 1, 2015, MSC issued a tenth amendment to the RFQ, closed discussions, and requested final quote revisions. AR 904–14.

On May 3, 2015, MSC reviewed Guam Shipyard's and Cabras's records in the Federal Awardee Performance and Integrity Information System and System for Award Management. AR 931–34. On May 4, 2015, Ms. Martinez prepared a draft IDIQ/Requirements Delivery/Task Order Award Documentation Record that found "[b]oth quotes" to be "technically acceptable." AR 941. Ms. Martinez recommended that Guam Shipyard be awarded the delivery order for $[REDACTED]. AR 940.

On May 19, 2015, Henry Bijak, another CO, signed the Award Documentation Record recommending Guam Shipyard for the award. AR 948. That same day, Mr. Bijak submitted the Contract Review Board ("CRB") Summary Sheet. AR 949.

The CRB was scheduled for May 20, 2015. AR 949. Prior to the CRB, the RFQ was cancelled. AR 949 (handwritten note stating that "[t]he CRB was cancelled and N10 directed this 'VR' be cancelled and reissued as an MTA to CABRAS [in accordance with] with the current contract language for the [Ship Repair Facility] contract").

On May 20, 2015, Michelle Siebeking-Knox, another contracting officer, wrote a memorandum justifying the cancellation. AR 1009–10. That same day, MSC notified Guam Shipyard and Cabras that the RFQ had been cancelled. AR 1011. Also on May 20, 2015, MSC issued a delivery order to Cabras under its IDIQ contract that involved the same thirty-one work

items as the cancelled RFQ. AR 115–16, 1020–24. "Shortly after" the cancellation, Guam Shipyard learned that Cabras had been awarded the work. Compl. ¶ 21.

On June 1, 2015, Cabras began work on the USS Frank Cable. AR 1022.

On June 2, 2015, Ms. Martinez confirmed via telephone that MSC awarded the task order to Cabras. AR 1222.

On June 4, 2015, MSC sent Guam Shipyard a letter justifying its cancellation of the RFQ. AR 1282–83.

## II. PROCEDURAL HISTORY.

On June 10, 2015, Guam Shipyard ("Plaintiff") filed a Complaint ("Compl.") in the United States Court of Federal Claims. That same day, Plaintiff filed a Motion For Preliminary Injunction And Permanent Injunction, and the court convened a telephonic status conference.

On June 11, 2015, the Government filed a Notice stating that it "will voluntarily stop work on the USS Frank Cable delivery order until the next conference with the [c]ourt, currently scheduled for Wednesday, June 17, 2015, excepting any work necessary to ensure the safety of the crew or vessel." Dkt. No. 8, at 1.

On June 17, 2015, Cabras ("Intervenor") filed a Motion To Intervene that the court granted that same day. Also on June 17, 2015, the Government filed the Declaration of the CO, Michelle R. Siebeking-Knox ("Siebeking-Knox Decl."), and the court convened a telephonic status conference wherein it granted Plaintiff's Motion For Preliminary Injunction.

On June 18, 2015, the court entered a Protective Order.

On June 19, 2015, the Government filed a Notice that it intended to take corrective action in lieu of filing the Administrative Record.

On June 22, 2015, the court convened another telephonic status conference.

On June 23, 2015, the court issued a Memorandum Opinion And Order granting Plaintiff's June 10, 2015 Motion For Preliminary Injunction. That same day, the Government filed the Administrative Record, under seal. On June 29, 2015, the Government filed a Supplemental Administrative Record, under seal.

On June 30, 2015, Plaintiff filed a Motion For Judgment On The Administrative Record ("Pl. Mot."). On July 6, 2015, the Government filed a Cross-Motion And Response ("Gov't Mot."). On July 10, 2015, Plaintiff filed a Reply ("Pl. Reply"). On July 15, 2015, the Government filed a Reply ("Gov't Reply").

## III. DISCUSSION.

### A. Jurisdiction.

As a matter of law, the court must consider jurisdiction before reaching the substantive merits of a case. *See Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented."); *see also* RCFC 12(b)(1) (allowing parties to assert lack of subject-matter jurisdiction by motion); RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). When deciding a subject-matter jurisdiction challenge, the court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in [the non-moving party's] favor." *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000).

The United States Court of Federal Claims has jurisdiction under the Tucker Act "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Pursuant to 28 U.S.C. § 1491(b)(1), the United States Court of Federal Claims has jurisdiction:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

*Id.*

On January 25, 1994, Congress enacted the Federal Acquisition Streamlining Act ("FASA") that, in relevant part, provides:

> (1) A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for—
>
>> (A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or
>>
>> (B) a protest of an order valued in excess of $10,000,000.
>
> (2) Notwithstanding section 3556 of title 31, the Comptroller General of the United States shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).

10 U.S.C. § 2304c(e).

As such, FASA confines the court's jurisdiction to adjudicate claims that challenge the underlying procurement vehicle, not any subsequent specific task order or award. *See SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1413 (Fed. Cir. 2014) (holding that FASA "effectively

eliminates all judicial review for protests made in connection with a procurement designated as a task order"). The import of FASA on the court's jurisdiction is discussed herein.

**B. Standing.**

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1). *See Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) ("In a bid protest, only an 'interested party' has standing to challenge a contract award."); *see also Myers Investigative & Sec. Servs. v. United States,* 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue."). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" under 28 U.S.C. § 1491(b)(1) as synonymous with "interested party" under the Competition In Contracting Act ("CICA"), 31 U.S.C. § 3551(2)(A). *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition of "interested party" for 28 U.S.C. § 1491(b)(1) purposes). A two-part test is applied to determine whether a protestor is an "interested party:" the protestor must show "1) that it is an actual or prospective bidder and 2) that it has a direct economic interest [in the procurement or proposed procurement]." *Orion Tech.*, 704 F.3d at 1348; *see also Distrib. Sols., Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008) (same).

In addition, to establish "interested party" status, a protestor must show the alleged errors in the procurement were prejudicial. *See Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378–79 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (citations omitted); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing.").

Importantly, a proper standing inquiry must not conflate the requirement of "direct economic interest" with prejudicial error. *Labatt*, 577 F.3d at 1380 (Examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful."). A party demonstrates prejudice when "it can show that but for the error, it would have had a substantial chance of securing the contract." *Id.* at 1378.

In addition, a party must also show "how the [G]overnment's error caused [it] to suffer disparate treatment or particularized harm." *Id.* at 1380. "[N]on-prejudicial errors in a bid process do not automatically invalidate a procurement." *Id.* (citing *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.")).

In this case, Guam Shipyard submitted a proposal in response to the RFP. AR 719–37. As an interested bidder, Guam Shipyard satisfies the first element of the "interested party" test. *See Distrib. Sols., Inc.*, 539 F.3d at 1344 ("To qualify as an 'interested party,' a protestor must establish that . . . it was an actual or prospective bidder or offeror[.]").

As to the second element, *i.e.*, that plaintiff "had a direct economic interest" in the proposed procurement, Guam Shipyard submitted the lowest price bid, and pre-award documentation shows that several Government officials favored awarding the RFQ to Guam Shipyard. *See, e.g.*, AR 941 (Martinez recommendation). Thus, Guam Shipyard satisfies the second element of the "interested party" test. *See Distrib. Sols., Inc.*, 539 F.3d at 1344 ("To qualify as an 'interested party,' a protestor must establish that . . . it had a direct economic interest in the procurement or proposed procurement.").

As to prejudice, MSC cancelled the RFQ even though internal documentation shows that Guam Shipyard was likely to receive the award. *See* AR 941 (Martinez recommendation). MSC's cancellation of the RFQ prejudiced Guam Shipyard, because "there was a 'substantial chance' [that Plaintiff] would have received the contract award but for the . . . error[] in the bid process." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005); *see also Labatt*, 577 F.3d at 1380 ("To establish prejudice a protester must show that there was a substantial chance it would have received the contract but for the [G]overnment's error in the bid process.").

For these reasons, the court has determined that Guam Shipyard has standing to seek an adjudication of this bid protest.

**C. Standard Of Review.**

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims is authorized to review challenges to agency decisions, under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (same).

When a bid protest is based on a regulatory or procedural violation, *i.e.*, "not in accordance with law," our appellate court also has imposed an additional requirement that "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009).

If an award decision is challenged as made without a rational basis, the trial court must determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (citation omitted); *see also Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) ("[W]e must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors.") (alteration omitted); *Weeks Marine*, 575 F.3d at 1368–69 ("We have stated that procurement

decisions invoke highly deferential rational basis review . . . . Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (citations omitted).

In the alternative, if an award decision is challenged on the grounds that an agency acted in an arbitrary or capricious manner, the court may intervene "only in extremely limited circumstances." *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983). "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In this case, the parties have filed Cross-Motions For Judgment On The Administrative Record, requiring the court to conduct a proceeding akin to an expedited trial on the record. *See* RCFC 52.1[4]; *see also Bannum*, 404 F.3d at 1356 ("[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record."). The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, although the court has not conducted an evidentiary proceeding. *Bannum*, 404 F.3d at 1357 (authorizing the court to make "factual findings under RCFC [52.1] from the [limited] record evidence as if it were conducting a trial on the record").

### D. Whether The Federal Acquisition Streamlining Act Precludes The Court From Adjudicating Plaintiff's Bid Protest.

#### 1. The Government's Argument.

The Government argues that the court does not have jurisdiction to adjudicate Plaintiff's claim, "because this protest 'is in connection with' the cancellation of an RFQ for a proposed delivery[.]" Gov't Mot. at 6–7 (citing 10 U.S.C. § 2304c(e); *SRA Int'l*, 766 F.3d at 1413 ("The statutory language of FASA is clear and gives the court no room to exercise jurisdiction over claims made 'in connection with the issuance or proposed issuance of a task or delivery order.'")). "Guam Shipyard is protesting the cancellation of an RFQ [that] . . . contemplated the issuance of a task or delivery order under an existing IDIQ contract and is directly 'in connection with' a proposed task or delivery order." Gov't Mot. at 9. "[A] direct challenge to the delivery order would undeniably fall within the FASA ban," and Plaintiff "is attempting to circumvent the clear language of FASA by indirectly seeking relief that would be unavailable in a direct challenge[.]" Gov't Mot. at 9.

---

[4] In 2006, RCFC 56.1 "Review of a Decision on the Basis of the Administrative Record" was repealed and replaced with RCFC 52.1 to conform to the United States Court of Appeals for the Federal Circuit's decision in *Bannum*, 404 F.3d at 1354 (holding that the court should "make factual findings from the record evidence as if it were conducting a trial on the record"). *See* RCFC 52.1, 2006 Rules Committee Notes.

> The FASA ban is not limited to situations in which a task or delivery order will necessarily be issued. Rather, the statute applies when the agency issues a task or delivery order *and* when the issuance is only "proposed." *See* 10 U.S.C. § 2304c(e). FASA does not require that a proposed task or delivery order actually be issued. *Id.* Therefore, the fact that a cancellation will not lead to a delivery order does not remove the agency decision from the clear terms of the FASA ban. . . . MSC's decision to cancel the RFQ was inextricably connected with the decision of whether to issue the proposed delivery order. It is the issuance of that proposed delivery order that [Plaintiff] hopes to gain if it prevails in this protest.

Gov't Reply at 3 (emphasis in original).

### 2. Plaintiff's Response.

Plaintiff responds that the court "has jurisdiction . . . because the cancellation of the VRA RFQ 'may be viewed as a discrete procurement decision' distinct from the proposed issuance of a delivery order." Pl. Reply at 2 (quoting *BayFirst Solutions, LLC v. United States*, 104 Fed. Cl. 493, 507 (2012)). Plaintiff "is protesting the cancellation of a solicitation," not the issuance or proposed issuance of a delivery order. Pl. Reply at 2. "By its very nature, the cancellation of a solicitation is a decision that is conceptually severed from the issuance or proposed issuance of a task order and clearly will not 'lead to the proposed issuance of a task order.'" Pl. Reply at 3 (quoting *Mori Assocs., Inc. v. United States*, 113 Fed. Cl. 33, 38 (2013)).

> Here, the cancellation of the VRA RFQ does not have a *direct and causal* relationship to the issuance or proposed issuance of a delivery order. The cancellation is a discrete procurement decision that does not implicate the FASA task and delivery order ban. As such, th[e c]ourt has jurisdiction to entertain [Plaintiff]'s protest.

Pl. Reply at 4 (emphasis in original).

### 3. The Court's Resolution.

The Tucker Act authorizes the United States Court of Federal Claims:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).

But, FASA provides that "[a] protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order," except in two circumstances[5] not relevant to this case. 41 U.S.C. § 4106(f)(1).

The United States Court of Appeals for the Federal Circuit has held:

> The statutory language of FASA is clear and gives the court no room to exercise jurisdiction over claims made "in connection with the issuance or proposed issuance of a task or delivery order." Even if the protestor points to an alleged violation of statute or regulation, . . . the court still has no jurisdiction to hear the case if the protest is in connection with the issuance of a task order. We acknowledge that this statute is somewhat unusual in that it effectively eliminates all judicial review for protests made in connection with a procurement designated as a task order—perhaps even in the event of an agency's egregious, or even criminal conduct. Yet Congress's intent to ban protests on the issuance of task orders is clear from FASA's unambiguous language.

*SRA Int'l*, 766 F.3d at 1413 (quoting 41 U.S.C. § 4106(f)(1)).

Here, the parties rely on two cases from the United States Court of Federal Claims to support their positions: Plaintiff cites *BayFirst*; and the Government cites *Mori*.

In *BayFirst*, the plaintiff filed a pre-award protest against the United States Department of State ("State Department"). 104 Fed. Cl. at 497. In 2006, the contract work originally was awarded as a small business set aside. *Id.* at 498. In 2010, when the incumbent lost its small business status, the State Department issued a solicitation to other small businesses. *Id.* Meanwhile, it anticipated awarding an interim three-month contract to BayFirst's competitor until the solicitation could be awarded. *Id.* BayFirst filed a bid protest, because it sought to bid on the interim contract as well as the longer-term solicitation. *Id.*

In determining whether FASA precluded BayFirst's protest, the court stated that "[t]here seems to be some variation in this court's approach to interpreting the term 'in connection with' when applying the ban on task order protests in particular cases." *Id.* at 502. "It appears that these variations in interpretation . . . arise in the complex and distinct fact patterns of individual bid protests." *Id.* at 503. The court concluded, "Although this is a close question, the court views the State Department's decision to cancel the Solicitation as a decision not 'in connection with' the proposed issuance of a task order." *Id.* at 507. In support, the court stated that "[t]he cancellation of the Solicitation may be viewed as a discrete procurement decision and one which could have been the subject of a separate bid protest." *Id.* Although acknowledging that "the [United States Court of Appeals for the] Federal Circuit has a broad view of the agency actions that are 'in connection with' a proposed procurement," the court concluded that it "must draw a line where one 'in connection with' series of actions ends, and another 'in connection with' series of actions

[5] Those two circumstances are: "(A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or (B) a protest of an order valued in excess of $10,000,000." 10 U.S.C. § 2304c(e)(1).

begins. In the court's view, in this case that line falls squarely at the cancellation of the Solicitation." *Id.* at 508. But, "the record before the court could be read either way, and the law is not entirely clear on the application of the task order protest ban." *Id.* at 507.

The following year, the *Mori* court determined that it "[was] not even a close question" that FASA prevented a challenge to solicitation cancellation. 113 Fed. Cl. at 37. In that case, the protestor was the incumbent contractor providing information technology ("IT") services to the National Institutes of Health ("NIH"). *Id.* at 35. Upon expiration of the incumbent contract, NIH awarded the contract to a competitor. *Id.* at 36. Following several bid protests, NIH cancelled the solicitation and awarded the contract by requesting proposals from holders of existing task order contracts—a mechanism under which the plaintiff was unable to compete. *Id.*

The *Mori* court stated that "the phrase 'in connection with' means that there is a direct and causal relationship between two things that are mutually dependent." *Id.* at 37 (quoting *DataMill, Inc. v. United States*, 91 Fed. Cl. 740, 756 (2010)). "An agency's underlying decision to procure goods or services without competition through a delivery order has a direct and causal relationship to the 'issuance' or 'proposed issuance' of the delivery order that the agency ultimately utilizes to effectuate the procurement." *Id.* at 38 (quoting *DataMill*, 91 Fed. Cl. at 756). "Not every decision that precedes the selection of a task order vehicle is so bound up with the proposed issuance of a task order that a protest of the decision would be prohibited by FASA." *Id.* "Discrete, preliminary matters that may not necessarily lead to the proposed issuance of a task order may still be protested." *Id.* "But when a protest challenges a decision to obtain services by requesting proposals from [IDIQ] task order contract holders, the FASA prohibition on protests clearly applies." *Id.*

In the court's judgment, this bid protest is more analogous to *Mori* than *BayFirst*. In *Bayfirst*, the solicitation sought bids for a new contract, not a new task order. *See Bayfirst*, 104 Fed. Cl. at 507. But, in both *Mori* and this case, the Government cancelled a solicitation for a task order under an IDIQ contract. *See Mori*, 113 Fed. Cl. at 37 (finding that the protestor's "protest of the decision to use the *task order* . . . . is not even a close question"); *see also* AR 111–16 (issuance of RFQ), 1020–28 (issuance of delivery order to Cabras). As the court in *Mori* determined, "when a protest challenges the decision to obtain services by requesting proposals from [IDIQ] task order contract holders, the FASA prohibition on protests clearly applies." *Mori*, 113 Fed. Cl. at 38.

In any event, whatever "variations in interpretation" might have existed at the time of *BayFirst*, the United States Court of Appeals for the Federal Circuit subsequently clarified in *SRA International* that FASA prohibits bid protests in connection with task orders, even if it renders judicial review impossible. *See SRA Int'l*, 766 F.3d at 1413; *see also Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1254 (Fed. Cir. 2015) (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) (holding that, in construing the Tucker Act, the "operative phrase 'in connection with' is very sweeping in scope"); *see also Chameleon Integrated Servs., Inc. v. United States*, 111 Fed. Cl. 564, 570 (2013) (stating that "FASA applies broadly"); *see also Innovative Mgmt. Concepts, Inc. v. United States*, 119 Fed. Cl. 240, 245 (2014) (dismissing a bid protest when the protestor challenged a task order award, but not "the underlying procurement vehicle"). The parties have not disclosed, and the court has not found, any post-*SRA International* case holding that the United States Court of Federal Claims has jurisdiction to

adjudicate a bid protest concerning the cancellation of a task order solicitation. In light of *SRA International*, the court has determined that cancelling a task order under an IDIQ contract is "in connection with" a task order.

As such, the court has determined that FASA bars this bid protest. Because FASA bars Plaintiff's bid protest, it is not necessary to decide the merits of the case.

## IV. CONCLUSION.

For these reasons, Plaintiff's June 30, 2015 Motion For Judgment On The Administrative Record is **denied**. The Government's July 6, 2015 Cross-Motion is **granted**. The Clerk of Court is ordered to dismiss Plaintiff's June 10, 2015 Complaint. The June 17, 2015 Preliminary Injunction is lifted.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN,**
**Judge.**